UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| REBECCA GRANDE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:08-cv-0183-RLY-DML |
| | ) | |
| MARION COUNTY SHERIFF, CITY OF | ) | |
| INDIANAPOLIS, SHEILA SHIVELY, | ) | |
| SHERRY WRIGHT, RICHARD | ) | |
| MANSHIP, DEBBIE BLAKE, DENISE | ) | |
| MITTLESTRASSER and | ) | |
| CORRECTIONAL MEDICAL SERVICES, | ) | |
| INC., | ) | |
| Defendants. | ) | |

**ENTRY ON SUMMARY JUDGMENT MOTIONS**

Plaintiff, Rebecca Grande, lost control of her vehicle around 4:00 p.m. on

September 23, 2006, and drove it into a barrier on the side of the road, causing her to be

injured.  After an ambulance arrived to transport Grande to the hospital, the officer who

came to the scene of the accident determined that an open arrest warrant existed for

Grande.  He placed Grande under arrest and directed the ambulance to take her to

Wishard Hospital ("Wishard") for treatment.  Following treatment, Wishard released

Grande to the Marion County Arrestee Processing Center ("APC"), a facility manned by

employees and contractors of several local government agencies.  Grande claims that

while she was at the APC being processed, several individuals demonstrated deliberate

indifference to her serious medical needs in violation of her constitutional rights.  She

also claims these individuals were negligent in their treatment of her causing her

additional pain and injury. She has brought this action against those individual defendants and their employers, pursuant to 42 U.S.C. § 1983 and Indiana negligence law.

Defendant Correctional Medical Services, Inc. ("CMS") and its employee, Sherry Wright, have filed a motion (Docket # 73) seeking summary judgment. So too have the Defendants, Marion County Sheriff, City of Indianapolis and their individually named employees, Debbie Blake, Denise Mittelstrasser, Sheila Shively and Richard Manship (Docket # 76). This entry will address both summary judgment motions.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the evidence of record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The nonmoving party, however, may not rest on mere allegations or denials in its pleadings, but "must set forth specific facts

2

showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). Factual disputes that are irrelevant or unnecessary to the claims before the court will not alone defeat a summary judgment motion. *Anderson*, 477 U.S. at 247-48.

Summary judgment is also proper, indeed it is mandated, when it is clear that the plaintiff will be unable to satisfy the legal requirements necessary to establish his case. *See Celotex*, 477 U.S. at 322. Under this scenario, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323. The moving party is, therefore, entitled to judgment as a matter of law due to the nonmoving party's failure to make a sufficient showing on an essential element of which he carried the burden of proof. *Id*.

## FACTUAL BACKGROUND[1]

The APC is a 24-hour secure facility for processing and providing initial court proceedings to individuals arrested in Marion County, Indiana. It is not intended to be a long-term detention or prison facility and it is operated jointly by several local government agencies. Hundreds of arrestees are processed at the facility on a daily basis. Typically, the processing of a non-priorty arrestee at the APC takes approximately twelve hours; however, if volume is heavy, processing can take more than a day. Priority is given to those arrestees who have significant medical issues. These arrestees complete

---

[1] Unless explained as testimony in conflict, the facts are recited with all reasonable inferences made in a manner most favorable to the nonmovant, Plaintiff.

the process in an average of four hours.

Processing at the APC includes, but is not limited to, security searches, medical screening, photographing, fingerprinting, bail interviews and initial court appearances. The initial judicial hearing is the last process at the APC for an arrestee, after which he or she is either released on their own recognizance or released to the custody of law enforcement officers for transport to a jail facility. In 2006, the APC was supervised by an employee of the Sheriff's Department. Since that time, there has been a law enforcement consolidation in Marion County, Indiana and the law enforcement division of the Sheriff's Department has combined with the Indianapolis Police Department to form the Indianapolis Metropolitan Police Department.

It is, and was at the relevant time, the policy of the law enforcement agencies within Marion County that an arrestee, with a serious medical condition warranting immediate treatment, be taken to Wishard Memorial Hospital ("Wishard") prior to being processed at the APC. Typically, after the arrestee is released from the hospital, he or she is transported immediately to the APC. The medical determination of when an injured arrestee can be released for processing at the APC is made by Wishard medical professionals.

Defendant CMS is a contractor responsible for providing medical services and limited medical care on site at the APC. The primary role of the CMS medical professionals is to conduct a medical survey of an incoming arrestee and identify any relevant medical issues. It is a CMS professional, most often a nurse, who conducts the

mental and physical health survey of an arrestee after the arrestee undergoes an initial security search.  There is always at least one CMS health professional at the APC and more at busier times.  There is no requirement that an arrestee, who arrives after receiving treatment at Wishard, provide any particular documentation to CMS personnel at the APC.  In taking the initial medical survey, the CMS professional relies on the answers provided by the arrestee as well as any medical documentation which they do provide.

If an arrestee develops or complains of a medical problem while at the APC, those problems are brought to the attention of a CMS employee for evaluation.  Arrestees are only at the APC for a limited amount of time; consequently, unless the medical problem is one of an acute type which CMS is prepared to address, most serious medical problems requiring immediate medical attention result in the CMS employee directing that the arrestee be transported to Wishard Hospital.  No medicines other than those used in connection with acute trauma treatment, such as nitroglycerine tablets or insulin, are stocked or dispensed by CMS employees.

On September 23, 2006, following her automobile accident and arrest on an outstanding traffic warrant, Grande was taken from the scene of the accident to Wishard by ambulance in order that she could receive treatment for her injuries.  She was given some pain medication while on board the ambulance, but was not complaining of severe pain yet.  The records indicate that she arrived at the hospital at approximately 5:00 p.m. on Saturday, September 23, 2006.

While at Wishard, she received numerous x-rays, a CAT scan, additional pain

medication and was examined by at least two physicians.  The pain in her right arm, which she indicated was minimal immediately following the accident but began building as she was being taken to Wishard, increased significantly during the approximate 11 hour period of time she was at the hospital.  The x-rays taken revealed that Grande had broken the humerus bone in her upper right arm.  The physicians at Wishard informed her that she would need to see a surgeon promptly following her release as there was an imminent need for surgery.  The arm was splinted and Grande was told that she should keep her arm up against her chest and immobilized to reduce the pain and the chances for further damage.  She was also prescribed additional pain killing drugs.  The treating physician assumed that Grande was given a sling at the time of her discharge to assist in supporting her arm, but she was not given a sling.  The hospital discharge instructions issued to Grande early Sunday morning indicated that she should be seen by a surgeon no later than Tuesday, September 26, 2009, due to the urgent need for surgery on her broken arm.  She was informed that she would be directed to a phone bank where she could call such a doctor to make an appointment; however, at the time of her discharge she was not taken to a phone where she could make such a call, but rather was released to the custody of law enforcement at 4:02 a.m. for transport to the APC.[2]

      Upon arrival at the APC, arrestees are searched and then screened by the medical

---

[2] Though there is no evidence of record indicating why Grande was not directed to a phone at Wishard to make the call referred to in her discharge papers, the court notes that it was 4:00 a.m. on a Sunday morning and the likelihood that an appointment could be scheduled over the phone at that time is small.

staff.  Grande was initially placed in the general holding area for women arrestees, and her detailed medical survey was taken by a CMS nurse, Defendant Sherry Wright. Grande has no recollection of the medical survey process, but has not challenged that the survey was taken.  While the APC records include a completed medical survey, nurse Wright has no specific memory of her interview of Grande, which is not surprising as she would typically complete 40 or more surveys each shift at the APC.  The medical survey which Wright completed, indicates that Grande was in obvious pain and had some restricted mobility.  Additionally, Grande's vital signs were found to be within normal limits.  By asking the questions on the medical intake questionnaire and reviewing the paperwork from Wishard, Wright identified that Grande had been in a motor vehicle accident, had been seen by a doctor and needed to be seen by a surgeon by Tuesday of that week.

Tammy Wood was an APC supervisor whose shift began at 6:00 a.m. on September 24, 2006.  When she arrived at the APC shortly after 5:00 a.m., she heard a person crying loudly in the general holding area and asked the staff on duty what the problem was with whoever was making all the noise in the holding area.  She was told it was someone who had come to the APC through Wishard and had been complaining loudly of ongoing pain in the arm she had injured.  After a quick review of Grande's paperwork and a discussion with Wright, which confirmed Wishard had released Grande and nothing further could be done by CMS for her complaints of pain, Wood ordered Grande be put in a separate cell and processed as a medical priority.  At 5:13 a.m., which

7

Grande estimates to have been 20 minutes after she arrived in the open holding area, she

was placed in a separate cell which was equipped with a call button.  The call button in

such cells can be pushed to report medical problems.

      After about 45 to 60 minutes in the cell, Grande began experiencing numbness in

her right hand.  At that point, as she describes, "I was crying rather loudly and really

freaked out...."  She began pushing the call button, "begging for someone to come see

me."  From the cell control room came an intercom message directing Grande to sit down

and settle down.  A few minutes later Grande again panicked and began pushing the call

button.  This time the response was that there was nothing that could be done for her at

that point and that she should calm down and wait to get through processing.  Later,

Grande held her finger on the button for long periods of time, but received no further

response.

      Defendants Debbie Blake and Denise Mittelstrasser were the APC cell control

operators on duty during the early morning hours of September 24, 2006.  Neither Blake

nor Mittelstrasser have a specific memory of Grande or the events of that particular

morning.  Wood, their supervisor, does have a specific memory, in part because she had

recognized Grande's name when reviewing the arrest report and knew that they attended

the same church.  Wood was contacted by the cell control operators and informed that

Grande was pushing the call button and complaining of pain, but the response from CMS

personnel was that nothing further could be done.  As a follow-up, Wood herself

confirmed with CMS personnel that nothing further could be done to address Grande's

complaints.

The court area of APC usually opens around 7:00 a.m. and the staff in that area begin preparing for initial hearings, which begin after a judge arrives. Often, hearings do not start until after 8:00 a.m. Wood contacted court personnel, who arrived shortly before 7:00 a.m., and informed them that she had a medical priority who needed to be processed promptly. At 6:30 a.m., after approximately an hour and 15 minutes in the cell, Grande was taken from the cell by Defendant Sheila Shively and escorted first to photographing to begin the final processing before her initial hearing.

Grande complains of the way she was treated by Shively. When Shively arrived at Grande's cell to take her through the remainder of her processing, she told Grande that she was tired of her "crying and boo-hooing" and, if Grande did not stop, Shively would put her back in the cell and let her stay a couple nights before getting processed. Grande explained to Shively that she was crying because of the pain she was experiencing in her arm. According to Grande, Shively showed no sympathy whatsoever, stating that she did not care why Grande was crying and asking Grande if she could "shut up" long enough so that Shively could get her "out of here." As Shivley took her to get photographed, Grande agreed to try to stop crying, but also states that she would let out a whimper or scream with certain movements as she moved along because the pain would increase when Grande moved.

Shively recalls only that Grande had been in a cell for medical reasons and that she complained of arm pain when Shively brought her out to photograph her. Shively

assumed Grande had been to the hospital because most of the people put in "medical cells" have been to the hospital.  As Shively was preparing to photograph Grande, she told Grande to sit down.  Grande indicated that she would prefer not to sit because every time she moved to sit down or stand up she felt pain.  Shively insisted that Grande sit down.  Grande claims that Shively intimidated her, showed no concern for her medical condition and, despite her explanation of various movements causing her pain, gave her no options while making her sit and later stand for the photographing process.

From the photographing station, Grande proceeded to the fingerprinting area, which was manned by Defendant Richard Manship, an Indianapolis police officer. Manship explained the fingerprinting process to Grande, including an explanation that she would need to place her hand on a print scanning table.  Grande immediately explained that she was splinted because of a broken arm and told Manship that she would not be able to lift her arm or hand to the table, begging him not to make her go through this part of the process.

Unlike, Shively, Manship did not respond rudely.  He asked Grande if she had ever been in trouble before and told her that, because she was not "in the system," he had to have her fingerprinted and that he would do his best to help her get through the process. The policy at the APC for fingerprinting is that officer Manship, or whoever else has the responsibility, is to get as complete a set of finger and palm prints from an arrestee as possible, especially if the person has not been fingerprinted in the past, as in Grande's case.  If a person is bandaged or otherwise incapable of providing a certain type of print,

exceptions are made as to those particular digit or palm prints.

Manship testified in deposition that he remembers that Grande was upset and that she had her arm in some type of cast or sling and that she wanted to get out of the APC. Manship operates what is called a "LiveScan Unit" in order to fingerprint an arrestee and the machine can be lowered or raised in adjustment for a person's height or disability.  He raises and lowers the machine to accommodate all arrestees and states that he would have done so for Grande and assisted her in whatever way he could.  Grande states that after obtaining prints from her left hand,  Manship helped her lift her right hand on to the scanning table.  Both Manship and Grande recall hearing a crack or pop like noise from her arm as that was done.  Grande states that this caused her immense pain and that she screamed out and pulled away, only to have Shively, who was somewhere behind her in the room, threaten to take her back to her cell.  Manship told Grande she was being a bit over dramatic and then went ahead and obtained prints from all of the fingers on her right hand, but he determined not to attempt to take the right palm prints.

Once fingerprinting was completed, Grande was escorted to the court area of the APC at 6:56 a.m.  She claims that following her fingerprinting she had increased numbness and pain and could not fully extend her right wrist and fingers.  Throughout her processing, Grande claims she was constantly asking to be seen by a doctor and inquiring if she could have a sling.  Grande was processed through APC in three hours and forty-one minutes.  She was released from the APC at 7:43 a.m. following her initial hearing and was picked up by her father, who drove her first to Wishard and then, after being

11

refused further treatment there, to the emergency room at Community North Hospital in Indianapolis, where she received a sling.

On September 25, 2006, Grande was seen by Dr. Eric Lemming.  He performed surgery on Grande's right arm that same evening.  In addition to the broken bone, Grande suffered nerve damage and later underwent a second surgery in an attempt to repair that damage.  Her broken arm has fully recovered, but Grande continues to endure nerve damage to her right arm and cannot fully utilize her right hand which resulted in an extended time off of work.  Dr. Lemming has opined that Grande's nerve damage was likely caused or exacerbated by the manipulation of her arm while at the APC.

In addition to this action, Grande has brought a malpractice action against Wishard and the physicians who treated her at that hospital.

## ANALYSIS

Plaintiff has brought both a § 1983 and a state law negligence claim against each of the Defendants.  Though both summary judgment motions seek summary judgment with respect to the federal claim, only the motion filed by CMS and nurse Wright seeks summary judgment on Grande's negligence claim.

**Negligence Claim**

In support of their summary judgment motion, CMS and Wright offer the affidavits of Monica Speckman, R.N., and Dr. Michael Mitcheff, both of whom opine that the actions of Wright were consistent with the applicable standard of nursing care.  In addition, CMS and Wright argue that Wright took no action which was contrary to the

instructions in Grande's discharge from Wishard and there is no expert testimony

establishing an applicable medical standard of care which went unobserved.  Grande

counters that CMS and Wright failed to timely identify nurse Speckman and Dr. Mitcheff

as medical experts who would offer opinions in support of a summary judgment motion

and, therefore, the court should not allow their affidavits as supporting evidence.  In

addition, Grande maintains that her case against Wright and CMS (as *respondent*

*superior*) requires no expert medical testimony.

The court agrees with Grande that, for purposes of summary judgment, CMS' and

Wright's expert testimony has been submitted without timely identification.  Expert

opinions used to support a summary judgment motion filed by a defendant were to be

disclosed thirty days in advance of filing the summary judgment motion.  *See* Amended

Case Management Plan, Docket # 38.  CMS and Wright did not observe this deadline.

Consequently, the court will not consider the affidavits in analyzing the merits of the

summary judgment motion.  However, it is not the lack of supporting expert testimony on

the part of CMS and Wright that is of primary import here; rather, it is the lack of any

expert testimony establishing an applicable medical standard of care or supporting

Grande's assertion of a breach of such a standard on the part Wright.

Because the Wishard medical records establish that Grande was given her last dose

of pain medication shortly before her discharge and was not to receive another dose for

four to six hours, Grande has voluntarily dismissed any claim that the failure to provide

her with pain medication at the APC was negligent.  This begs the question of what it was

13

that Wright did or did not do that Grande believes was negligent.  Grande contends that she should have been given a sling, should not have had her arm manipulated and should have been allowed to see a doctor.  She offers no expert medical opinion to that effect, but maintains that not all medical negligence claims require support from expert testimony.

It is true that Indiana law recognizes that not all medical negligence claims require supporting expert testimony.  *Stumpf v. Foster*, 524 N.E.2d 812 (Ind. App. 1988).  However, as more than one Indiana court has stated, cases which do not require expert testimony are the ones which fit within a "common knowledge" or *res ipsa loquitor* exception, such as leaving a foreign object within a patient's body or breaking a bone while attempting a chiropractic manipulation.  *Methodist Hospitals, Inc. v. Johnson,* 856 N.E.2d 718, 721 (Ind. App. 2006); *Lusk v. Swanson*, 753 N.E.2d 748, 753 (Ind. App. 2001).  Only where the medical practitioner's action or inaction is so obviously substandard that a jury can assess such from the facts without the need to possess an understanding of the appropriate medical standard of care should courts allow such a claim to proceed without the support of expert testimony.  Here, the court cannot say that a layperson could infer solely from the facts of record that Wright was negligent.

Setting aside for the moment the fact that there was no sling on site for Wright to give Grande, there was also no indication in the patient's hospital discharge documents that a sling was necessary or should be obtained.  Further, despite Grande's insistence that the treating physician at Wishard wanted her to have a sling, there is no evidence that he

14

prescribed a sling or made any mention of it while she was at the hospital.  The evidence relied upon by Grande in asserting the need for a sling is only the treating physician's answer to an interrogatory question in the malpractice litigation brought against him.  The interrogatory asks him to identify what, if any, medical equipment or supplies were provided to Grande at the time of her discharge.  While the doctor was not actually at the hospital at the time Grande was discharged, his interrogatory response states: "Dr. Bell believes plaintiff was in a hard immobilizer with a sling."  Such a statement may indicate what the doctor assumed occurred, but it is not evidence to establish that a sling was required; and, even if it were, it would support the notion that someone at Wishard should have provided a sling, not that Wright, who was not given any such instruction and was not privy to the expectation of the physician, was negligent.

Grande argues that Wright should have let her see a doctor in response to her complaints made via the medical call button and also should not have allowed Grande's arm to be manipulated.  First, what is known from the evidence is that the operators, as well as their shift supervisor, checked with CMS personnel after receiving Grande's complaints and were told that there was nothing more they could do for her.  The court is unaware of any evidence that establishes that Wright was the only CMS medical professional at the APC that morning and, in fact, there is deposition testimony to the effect that weekends are generally a very busy time and Wright specifically testified that there were usually two nurses on duty during her shift.  Further, based upon the medical information Wright was provided, the lack of available treatment on site and Grande's

15

complaints being centered around her ongoing pain, it is entirely reasonable for anyone in Wright's position to assume that the quicker the APC was able to process Grande and allow her to pursue additional treatment, the better off she would be.  Finally, Wright did not manipulate Grande's arm and was not present at any time when her arm was manipulated.

In the end, there is entirely too little evidence to support a claim of negligence against Nurse Wright.  Grande is not a medical professional and her opinion of Wright's conduct is insufficient to establish her case.  Accordingly, Wright and her employer, CMS, are entitled to summary judgment on Grande's negligence claim.

## 42 U.S.C. § 1983 - Deliberate Indifference Claim

Pretrial detainees have a right to adequate medical care under the due process clause of the Fourteenth Amendment.  *See Williams v. Rodriguez*, 509 F.3d 392, 401 (7th Cir. 2007).  A claim of inadequate medical care under the Fourteenth Amendment requires the court to use the same standard for deliberate indifference that would be used for an inmate's Eighth Amendment claim.  *Id*.  To succeed with her claim, Grande must prove that she had a serious medical need and that the defendants were deliberately indifferent to the need.  *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).  Deliberate indifference is a conscious disregard of the circumstances and it is an extremely high standard to meet.  *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006).

There is an objective as well as subjective component to a deliberate indifference

16

claim.  *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).  Grande must prove that her

medical condition was "objectively, sufficiently serious."  *Farmer v. Brennan*, 511 U.S.

825, 834 (1994).  She must also satisfy the subjective component by showing that the

government officials were aware of the seriousness of her medical condition and acted

with a sufficiently culpable state of mind, disregarding an excessive risk to her health.

*Greeno v. Daley*, 414 F.3d at 653.  "[I]t is important to emphasize that medical

malpractice, negligence, or even gross negligence does not equate to deliberate

indifference."  *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).  Mere

dissatisfaction or disagreement with a course of treatment is generally insufficient, and if

a defendant is a medical professional, that person's decision regarding treatment is

deferred to unless "no minimally competent professional would have so responded under

those circumstances."  *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008)(quoting

*Collignon v. Milwaukee County,* 163 F.3d 982, 988 (7th Cir. 1998)).

**Sherry Wright**

Sherry Wright is a medical professional; however, in this case, the treatment of

Grande's injuries and accompanying pain was accomplished through the physicians and

nurses at Wishard Hospital.  After her arrest, pursuant to policy and the arrangement

between county law enforcement and the hospital, Grande was taken to the hospital

because her injuries required immediate attention.  That is not to say that once Grande left

Wishard there was no need for the arresting authorities to continue to provide adequate

medical care.  Certainly, if there are significant new medical developments which follow

17

an arrestee's release from Wishard, they must be evaluated and dealt with appropriately. However, the APC is not a long-term detention center and significant medical problems are fittingly handled at Wishard.

Wright's basic role here was to complete a medical history survey and assess whether Grande should proceed through processing at the APC.  Grande does not recall the medical survey process, but the evidence shows that a survey was completed and that Wright noted that Grande was in obvious pain.  As a practical matter, because Grande had just been seen and released from the hospital, Wright's assessment of the survey results was reduced to determining if Grande's medical circumstances had changed in any significant way since leaving the hospital, thereby necessitating a return to the hospital for further medical treatment.  Plaintiff can point to nothing in her medical records which would or should have caused Wright to determine that additional medical attention was necessary.  Wright appropriately documented Grande's ongoing pain and discomfort on the medical survey, but said pain and discomfort provided no basis for Wright to question the decision, made only minutes earlier, to release Grande from the hospital to be processed at the APC.  While a detainee should not be allowed to suffer pain needlessly when the same can be readily addressed, *see Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999), that is not the circumstance here, because the pain was attendant to an injury that had just been treated and Grande had been receiving pain medication, the last of which had been administered with direction that it not be supplemented for four to six hours.

Again, Grande contends that she should have been given a sling, should not have had her arm manipulated and should have been allowed to see a doctor.  However, Grande has not offered evidence of Wright's involvement past the initial medical survey. There was nothing in the medical documentation from Wishard that suggested that more than the splint on her arm was necessary and, while she claims that she told "everyone" that she needed a sling, she has no specific recollection of speaking with Wright or any medical professional at the APC.  Indeed, if there was neglect in failing to provide her a sling, then Grande's complaint is more properly aimed at the medical professionals at Wishard than at Wright and CMS.

There is no evidence that Wright allowed Grande's arm to be manipulated at any point in time or even that Wright was the CMS professional fielding the inquiry from cell operators or the shift supervisor.  Even if Wright was the CMS person who the operators or shift supervisor checked with when Grande pushed the call button in her cell, a response that nothing further could be done at the APC was accurate and Grande has offered no evidence to establish that a return to the hospital was warranted where no new injury was sustained.

While one might conclude that Grande's medical condition was "objectively, sufficiently serious," she has not met her burden of establishing that Wright was aware of facts from which she could infer that a substantial risk of serious harm existed if she were to continue through the processing at the APC.  No evidence has been submitted which would cause the deference given to any medical decision made by Wright to be forfeited.

19

Wright knew that Grande was in pain, but pain is to be expected with a broken arm and Wright also knew that Grande had received pain medication while at the hospital.  She knew that a determination had been made at Wishard that Grande's arm required surgery, but that it was not a fracture that had required immediate surgery at the hospital.  There was nothing that Wright could do about the pain and after nearly eleven hours of medical attention at Wishard, the promptness of further attention necessary to Grande's broken arm was determined to be about two days.  In the very limited time between the assessment at Wishard and the time when Grande was seen by Wright, nothing had changed that should have caused Wright to doubt the assessment which had been made by doctors at the hospital.  Wright did not ignore Grande's significant medical issues.  She accurately documented Grande's medical circumstances for future reference and use during Grande's detention and recognized that the doctors had released her for processing only minutes before her arrival.

**Debbie Blake and Denise Mittlestrasser**

Neither Blake nor Mittlestrasser are medical professionals.  Still, in order for Plaintiff to make her case, she must point to evidence in support of both the objective and subjective elements of a deliberate indifference claim.  As the control operators on duty at the relevant time, Blake and Mittelstrasser were assigned to stations with monitors and tasked with the responsibility of monitoring arrestee activities and movement at the APC.  Blake and Mittlestrasser were aware that Grande was a "medical priority" because she had been placed in a single cell where she could push a button to report medical

problems.  Grande was in the cell for less than two hours during her processing at the
APC.  During that time period, the control operators could see Grande on one of their
monitors and could hear her through an intercom system.  Though neither specifically
remember Grande, they testified at deposition that it is their custom to report an arrestee's
medical complaint to a nurse at CMS so that the nurse can make any necessary medical
decisions.  They also knew that no pain medication could be issued to arrestees while in
the APC.  There is insufficient evidence to establish that Blake and Mittelstrasser knew of
the particulars of Grande's injury, but the complaints which accompanied her pushing of
the call button may have been sufficient, when combined with the rest of the
circumstances to put them on notice that Grande likely had a serious medical condition.

The next step is to assess the available evidence of the two control operators'
subjective state of mind.  Grande claims that whichever control operator responded to her
first push of the call button simply told her to calm down and said that there was nothing
they could do for her.  She contends that the response was nearly immediate and allowed
no time for that person to have run Grande's complaint past a medical professional.  She
says that she was essentially told the same thing after she pushed the button a second time
and then received no further response when she continually kept the button pressed for
several minutes.  However, Grande is in no position to counter the testimony of Tammy
Wood, the shift supervisor, who has testified that the operators contacted her and CMS
because of all the button pushing and complaining that Grande was doing and that she
followed-up by contacting CMS herself regarding Grande's ongoing medical complaints,

but was told that there was nothing that could be done for her at the APC.[3]

A non-medical staff member at a detention facility is entitled to rely upon the advice of trained medical personnel. *Greeno v. Daley*, 414 F.3d 645, 655-56 (7th Cir. 2005). In *Greeno*, the Seventh Circuit recognized the need of non-medical personnel at a prison or other detention facility to assume that medical personnel are providing appropriate medical attention to the detainees, so that they do not venture into second-guessing what is an appropriate division of labor. *Id*. at 656. It might be different if complaints went totally ignored by non-medical personnel, but that is not the case here. *Id*. The advice provided by Blake and/or Mittelstrasser to Grande, that there was nothing that could be done at the APC and that she should sit down, calm down and await processing, was accurate and appropriate, based on what was being advised by the medical professional at the APC. Because they took action to relay Grande's complaints to a medical professional, no deliberate indifference was shown by either of these two Defendants.

**Sheila Shively**

Sheila Shively seems to have been the person most agitated by Grande's crying

---

[3] Grande questions the admissibility of Wood's testimony due to an alleged lack of personal knowledge as to whether Blake and Mittelstrasser contacted someone at CMS. However, Woods was a supervisor of these two defendants, and she personally took Grande's complaints, as reported to her by the operators, and notified a CMS medical professional on duty, receiving in response the advice that nothing more could be done at the APC. Even if Wood's testimony as to what those under her supervision did or did not do were somehow discounted for her lack of personal knowledge, she certainly knows what she, herself, did as a result of being contacted by those she supervised and what she did was sufficient to negate any claim by Grande that her complaints while in the cell were kept from CMS personnel.

and complaints.  Shively was the person at the APC who escorted Grande to and from her cell and took her booking photographs.  When she came to take Grande from her cell to complete the APC processing, Shively demanded that Grande stop crying and screaming if she wanted to be processed and released, and Shively threatened to leave Grande in the cell if she did not "shut up."  While taking Grande through the photographing process she made Grande sit down and wait for Shively to prepare the camera station, despite Grande's informing Shively of her medical problems and complaining that having to stand or sit down aggravated the pain in her arm.  According to Grande, Shively was rude and indifferent, claiming not to care why Grande was crying and making threats to send her back to her cell whenever Grande's pain would cause her to cry or scream.

Like most of the other Defendants, because of the vast numbers of arrestees processed at the APC, Shively has little specific recollection of Grande.  She remembers taking Grande's photo and that Grande was a medical priority, but little else.  Grande points out that she informed Shively and all others of her medical condition and explained what the doctors had told her regarding the need to keep her arm against her chest and avoid movement.  However, in response to Shively's assertion that, as a non-medical staff member she relied on the fact that Grande had been seen and treated by medical professionals, Grande argues that there is no evidence that Shively knew of any medical treatment having been provided.

Grande cannot have it both ways.  She can not maintain that she informed Shively and others at the APC of her medical problems and of what the doctors' recommendations

23

were regarding lack of arm movement, and then claim that those Defendants had no

knowledge of and cannot rely on any treatment that may have been provided to Grande

by medical professionals at Wishard.  Throughout her briefing, Grande attempts to

separate and put as much distance as possible between her medical treatment at Wishard

and her processing at the APC.  However, her treatment and processing are neither distant

in relation to time or distinct in relation to the local law enforcement policies for handling

arrestee's medical issues.  Because Grande had been arrested, but needed immediate

medical care, she was taken to Wishard pursuant to county law enforcement policy.  Also

pursuant to policy, upon completion of medical treatment at the hospital, she was

transported to the APC and that was accomplished  in a matter of minutes.  The fact that it

is policy for the Sheriff and the City to outsource emergency medical treatment of

arrestees to Wishard does not strip non-medical professionals, who are part of the

booking and temporary detention process at the APC, of their right to rely on the

judgment of the Wishard medical professionals, as well as those employed by CMS.  The

law does not expect Shively to make a medical determination regarding Grande's fitness

to be processed that is different from that which was made by those medical

professionals.

    In short, it is entirely reasonable for Shively to have noted Grande's listing as a

medical priority, heard her story of a broken arm and the treatment and recommendations

received from the Wishard doctors, seen Grande's splint and assumed that Grande would

not have been released from the hospital if simple sitting and standing would expose her

to serious medical complications.  Officials at a prison or detention facility do not act with deliberate indifference provided they are aware of the circumstances and that "medical staff is monitoring and addressing the problem." *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).  Further, there is no doubt that Shively was attempting to be rid of Grande's crying and complaining by moving her through the final processing as promptly as possible (within an hour of Grande's complaints to Shively regarding arm pain and movement she was out of the APC) and, thereby, minimizing any delay in her obtaining further medical treatment.

As for Shively's surly demeanor and intimidating tactics, they may be disconcerting traits, but they are not actionable.  To be as blunt as Shively was terse, Grande has no constitutional right to courteous treatment from law enforcement officials. *Slagel v. Shell Oil Refinery*, 811 F. Supp. 378, 382 (C.D. Ill. 1993).  Further,  Shively did not act on her threat to leave Grande in her cell or in any way delay her processing. To the contrary, she helped move Grande through the process in less than the average time it takes for an arrestee listed as a medical priority.  In the end, Shively may have acted unprofessionally, but she did not act with deliberate indifference to a serious medical need.

**Richard Manship**

Officer Richard Manship fingerprinted Grande.  Grande has no complaints with regard to Manship's demeanor, as she indicates he promised to help her through the process.  However, she does assert that after telling him of her broken arm and that she

25

would not be able to lift her arm so as to place her hand on the print scanning table, he nevertheless required her to do so, actually assisting her in lifting her hand to the table. This resulted in both Grande and Manship hearing a "popping noise" from her arm and Grande suffering a significant increase in pain.  After that point, Grande was unable to fully extend her right wrist and fingers.  What makes Manship's circumstance a bit different from the other non-medical personnel is that, despite Grande's protestations, Manship helped her move her arm so as to place her hand on the table.  None of the other staff actually required Grande to move her arm.  Shively simply asked her to sit down and stand up.

So, the question becomes whether or not Manship showed deliberate indifference to a serious medical condition because he insisted that Grande cooperate in placing her hand on the scanning table.  Again, the first step is to understand what Manship knew of Grande's medical circumstances.  He had the arrest report which contained the notation made by Woods indicating that Grande was a medical priority.  He could see her splint, and he was told by Grande that she had broken her arm and would not be able to lift it to allow her right hand to be placed on the scanning table.  Based on those facts, the court believes a jury could conclude that he had knowledge of the existence of a sufficiently serious medical condition.

Manship testified that since Grande had been to Wishard, he assumed she would have been seen by the doctors at the hospital and, he argues that, since he is not a medical professional he, too, should be allowed to rely on the fact that she would have received

appropriate medical treatment prior to her release.  Manship would also have been aware that Grande had already been through the medical survey process at the APC and seen by a CMS medical professional.  Manship was not privy to Grande's discharge documents and, while Grande has testified that she told Manship her injury prevented her from being able to lift her arm to the table, she has not testified that she told Manship, like she did others, of any restrictions ordered by the doctors or that her arm needed surgical attention. The inference Manship asserts he made, and now seeks to sanction, is that Grande would not have been released from Wishard for processing and passed through by the CMS nurse if her medical condition prohibited her from going through the fingerprinting process.

After considering the evidence Grande has proffered in support of her argument that Manship showed deliberate indifference, the court finds it insufficient to support a conclusion that Manship's conduct demonstrated "a sufficiently culpable state of mind." *Johnson v. Doughty,* 433 F.3d at 1010.  Grande admits that Manship was not agitated like Shively and was attempting to be helpful, both in getting her processed so that she could move on to the court facilities at the APC and in assisting her to place her hand on the table for the fingerprint scan.  While he knew that Grande said she could not lift her arm to the scanning table, this court believes that it would be entirely reasonable for Manship, or anyone in his position, to infer her fitness for fingerprinting from the fact that she had been released for processing by medical professionals after receiving treatment only a few hours previously.  The fact that the treatment was provided at Wishard, as opposed to the

27

APC, only serves to provide more credence to an inference of sufficient medical stability on the part of Grande to withstand the movements necessary to make it through APC processing.

Even if the court were to conclude that Grande offered sufficient evidence to support the requirement that she show subjective deliberate indifference on the part of Manship, it would still reach a conclusion favorable to Manship based on his defense of qualified immunity.   Qualified immunity is a defense against civil liability available to those people working for the government and performing discretionary functions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It is a question of law for decision by the court.  *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989).  Though it is a defense, once raised by the defendant, it becomes the burden of the plaintiff to overcome it.  *Jewett v. Anders,* 521 F.3d 818, 823 (7th Cir. 2008).

The two-part test for overcoming the defense is: (1) a determination that the actions of the government official actually violated the plaintiff's constitutional rights, and (2) establishing that the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *Lee v. Young,* 533 F.3d 505, 512 (7th Cir. 2008).  "A plaintiff must show, on some level, that a violation of this right has been found in a factually similar cases, or that the violation was so clear that the government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case."  *Id.*  Recently, the Supreme Court has indicated that there is no particular order in which a court must consider the two parts of the

qualified immunity test and, in this case, it is the second part of the analysis where
Grande falls short.  *Pearson v. Callahan,* __ U.S. __, 129 S.Ct. 808, 817-18 (2009)

Grande cites to *Gutierrez v. Peters,* 111 F.3d 1364, 1372 n.6 (7th Cir. 1997), and
the cases set forth in a footnote to that case, as precedent for finding that deliberate
indifference to a prisoner's pain would violate constitutional prohibitions.  However, even
the parentheticals that accompany the case citations in the footnote accurately identify the
cases as involving delays of days and weeks in addressing a prisoner's complaints of
pain, not, as is the case here, a delay of a couple of hours.  Indeed, there is precedent for
finding that a delay of two hours in providing initial care for a fracture is insufficient to
support a constitutional violation.  *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995).
Here, the delay was only in allowing Grande to pursue follow-up care.

Nevertheless, "delay" is not really the complaint which Grande aims at Manship;
yet, Grande has not offered any case law that would support a clear constitutional
violation when an official requires a detainee to go through necessary processing
requirements that the official may believe could cause a temporary increase in that
person's pain.  It is fairly clear that Manship was trying to move Grande through the APC
process to allow her to leave and pursue whatever additional medical treatment she
desired.  Her complaint against Manship is that he disregarded her statement to him that
she could not lift her arm to the table due to her broken arm.  To that end, what Grande
fails to provide is legal precedent which establishes that a jail or prison officer's disregard
of the protestations of a clearly injured, but also clearly treated (the splint) prisoner or

29

detainee, amounts to a constitutional violation.  Further, after assessing the problems in

taking prints from Grande's fingers, Manship decided not to pursue her right palm print,

which is not consistent with deliberate indifference to her pain.  Even if it was negligent

for Manship to have required Grande to lift her hand up to the fingerprinting table,

negligence does not equal deliberate indifference.  *Johnson v. Doughty*, 433 F.3d at 1013.

All in all, the court finds that a reasonable law enforcement official in Manship's position

would not have known that his actions were violating Grande's constitutional rights.

**CMS, Marion County Sheriff and City of Indianapolis**

"Governmental entities may not be held liable for the unconstitutional acts of their

employees unless those acts were carried out pursuant to an official custom or policy."

*Grieveson v. Anderson,* 538 F.3d 763, 771 (7th Cir. 2008).  Though a contractor, CMS

was acting under color of law and, as with the Sheriff or the City, it is subject to liability

if Grande had her constitutional rights violated as a result of its express policies or

customs.  *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 (7th Cir. 2002).

Plaintiff argues that "[t]he primary deficient practice which led to the exacerbation

of Ms. Grande's injury ... is the lack of adequate communication on health matters of the

utmost importance."  Even though she was given a medical priority and processed in a

third or less of the average time for arrestee processing, Plaintiff contends that the APC

(and therefore, the Sheriff and City) treats injured arrestees as though they were medically

sound.  In addition, according to Grande, APC or CMS should require more medical

documentation from Wishard so that an intake survey is not so reliant upon the responses

30

to questions from arrestees who are not medical professionals and may be on medication.

The only specific CMS policy identified by Grande which she contends caused her to be

denied her constitutional rights is the CMS policy Grande says exists which prohibits its

medical professionals from providing non-medical professionals with specific

information related to an arrestee's medical condition or needs.

First, a general "lack of adequate communication" is not a policy.  Second, with

regard to custom or practice, Grande has offered no evidence of others who have been

subjected to the same allegedly indifferent conduct as she complains of or of others who

somehow suffered medical complications as a result of a lack of documentation coming

from Wishard.  A custom cannot be established through a single incident.  *Palmer v.*

*Marion County*, 327 F.3d 588, 596 (7th Cir. 2003).   Further, Grande's assertion that she

and others who are injured are treated as though they were medically sound, other than

allowing them to be processed in an expedited manner, is based solely on her experience

and much too grandiose an assertion to be supported by the evidentiary record.

Nor is Grande's broad assertion that CMS has a policy that prohibits its personnel

from communicating with non-medical personnel regarding an arrestee's medical needs

or risks supported by the evidence.  The deposition testimony of Blake and Wright, cited

by Plaintiff in support of her assertion, does not provide a foundation for such a blanket

generalization.  Reviewing the cited Wright deposition testimony does not lead the court

to any facts that support such a conclusion and Blake (a non-medical APC professional)

simply testified that she would not be allowed to open an arrestee's medical file materials

31

or be told whether an arrestee might be HIV positive because it would violate HIPAA (Health Insurance Portability and Accountability Act) privacy rules.  Further, the record is replete with testimony indicating that non-medical personnel at the APC can and do report an arrestee's medical complaints to CMS personnel in order for a medical professional to determine if anything can or should be done and, at least in the case of Grande, the CMS response was relayed back to her by non-medical personnel.  The court sees no support for her claim that communication problems are a custom which caused her rights to be violated.

As anyone who has been forced to endure the onslaught of authorization forms given out to patients when visiting a doctor or hospital can infer, a person's medical history is private and there have been numerous federal and state laws or regulations that have been passed in an effort to insure that privacy.  *See e.g.*, 45 CFR § 160; Ind. Code §§ 16-39-10-1 though 16-39-10-4.  That CMS or the APC try to keep the exchange of medical information between medical professionals and non-medical personnel to a minimum is hardly surprising.  Nevertheless, with regard to Plaintiff, it is not as though the non-medical personnel were left blind or without information as to her condition. Those who processed Grande were all well aware that she had a splint, was in a single detention cell due to medical reasons (which typically meant she had been to Wishard) and had been made a medical priority.  Grande herself says she communicated her condition and restrictions from hospital doctors to most everyone she spoke with at the APC.  In the end, no policy or custom of CMS or the APC with regard to communication

32

of medical information led to the deprivation of any of Grande's constitutional rights.

Accordingly, no liability under 42 U.S.C. § 1983 can attach to any of the entity

defendants.

## CONCLUSION

At the heart of this dispute is the broader question of whether officials at the APC

should be able to rely on an arrestee's treatment and discharge from Wishard as an

indication that, without any ensuing additional physical injury or complications, the

arrestee can be taken through the booking and initial hearing process in an expedited

fashion without a likelihood of exposure to additional significant physical harm.  This

court is confident that, at least with regard to the circumstances present in this case, the

answer to that question is "yes."  Grande's complaints while at the APC were all with

regard to her broken arm, which had been treated and splinted and previous medical

attention was apparent to all whom she dealt with.  While some of the comments that may

have been made to Grande were less than what might be expected from professionals,

their was no deliberate indifference to her medical circumstances.  Further, nurse Sherry

Wright was not negligent in relying on Grande's recent treatment and release from

Wishard as a basis for her decision to allow her to proceed through APC processing.

The court **GRANTS** the summary judgment motion filed by Defendant CMS and

its employee, Sherry Wright (Docket # 73) and judgment will issue in favor of CMS and

Wright on the entirety of Plaintiff's Amended Complaint.  The court also **GRANTS** the

summary judgment motion filed by the Marion County Sheriff, the City of Indianapolis

33

and their individually named employees, Sheila Shively, Richard Manship, Debbie Blake and Denise Mittelstrasser (Docket # 76), which seeks judgment in their favor on Grande's claim of deliberate indifference under 42 U.S.C. § 1983.  The claims of negligence against these Defendants remain for further prosecution by the Plaintiff.

**SO ORDERED** this 27th day of August 2009.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

James F. Bleeke
SWEETIN & BLEEKE PC
jim@sweetinbleeke.com

David Robert Brimm
WAPLES & HANGER
dbrimm@wapleshanger.com

Carol A. Dillon
SWEETIN & BLEEKE, P.C.
carol@sweetinbleeke.com

Jaunae M. Hanger
WAPLES & HANGER
hangerj@iquest.net

Jonathan Lamont Mayes
CITY OF INDIANAPOLIS,
CORPORATION COUNSEL
jmayes@indygov.org

Richard A. Waples
WAPLES & HANGER
richwaples@aol.com

Alexander Phillip Will
OFFICE OF CORPORATION
COUNSEL, CITY OF INDIANAPOLIS
awill@indygov.org